Mitchell agt. Vermont Copper Mining Company.

# N. Y. SUPERIOR COURT.

ANN ELIZA MITCHELL, Executrix, &c., of SAMUEL L. MITCHELL, deceased, agt. THE VERMONT COPPER MINING COMPANY, SMITH ELY and JOSEPH J. BICKWELL.

*Sale of stock — regularity of proceedings — invalid sale.*

All the material steps of a proceeding to sell out a shareholder of a stock company for non-payment of an assessment, when questioned, should be clearly and satisfactorily proven ; especially so important a one as the giving of notice of the time and place of sale to the person to be affected, and whose rights are to be cut off.

Where checks of the parties from whom assessments were due were requested by the treasurer of the company, the tender in that form must be held sufficient, especially so, where no objection was made at the time of the tender to payment by check.

Where tender by check was made by a shareholder, for the amount of his assessment, to the president of the company on the morning of the day of sale, and before the sale, with directions not to have his stock sold for the assessment, *held*, that this was sufficient to prevent the sale.

And where the sale of the stock was made, notwithstanding such tender and directions, and was bid in by the president, individually, who claimed to purchase it for himself, *held*, that the sale was invalid ; that the president, the purchaser, acquired no title to himself, and the sale should be set aside.

*Special Term, June,* 1874.

VAN VORST, *J.*—Samuel J. Mitchell, the testator and owner of the stock, testified on the trial that he had not received notice by mail or otherwise from the officers of the proposed sale of his stock. But he saw a notice of the sale, advertised in one or more of the city papers. There is no positive evidence of the mailing to him of a copy of the notice of sale. The testimony of the treasurer is that he mailed notices to all the stockholders in default, as their names and residences appeared on the books. He had no distinct recollection, how-

ever, of mailing a notice to Mitchell, other than that he mailed notices to all the stockholders in default. .It is questionable whether that is sufficient to establish the giving of a distinct notice to Mitchell by mail of ten days before the sale, as provided for in the by-laws. There should have been, under the denial of Mitchell that he received such notice, positive proof of the mailing of a notice to him individually. All the material steps of a proceeding to sell out a shareholder for non-payment of an assessment, when questioned, should be clearly and satisfactorily proven; especially so important a one as the giving of notice of the time and place of sale to the person to be affected and whose rights are to be cut off. Some record should have been made and kept of the service of such notices, which would enable the party serving to prove the same beyond question. It should not be left to unaided recollection, or to be proved by a general statement of service upon all, from which it might be inferred that each was included.

But the decision of this case does not rest upon a failure of proof in this regard. Mitchell having seen a notice of the sale, before it took place, in the public papers, came into the city on the morning of the day. He was quite unwell. He went to his office, and told his clerk, Davis, that he did not want his stock sold; that he must attend the sale and prevent its being sold. The book-keeper and confidential clerk of Mitchell testified that he made out a check for the amount of the assessment, payable to the order of Smith Ely, the president of the company, and that the same was handed by either Mitchell or himself to another clerk, William C. Davis. Mitchell himself does not remember the circumstances in regard either to the making or delivery of the check. But the directions he gave to his clerk to have the sale attended, and the sale of his stock prevented, would include the payment of the assessments due. W. C. Davis testified positively that he received the check and took the same to the office of the corporation before the hour of sale, and there tendered

the same to Ely, the president, who declined to receive it, urging as a reason that the stock could not then be withdrawn, but at the same time stating that he would buy in the stock and protect it.   Davis protested against the sale.   Ely testified that no tender of a check was made to him; but that, on the other hand, a note was delivered to him from Mitchell, in which he expressed a readiness to pay if the president would give him some assurance of the correctness of the treasurer's accounts, which he declined to do.

That such note was delivered to Ely on the morning of the day of sale is established.

In regard to the check, I am of opinion that the preponderance of evidence is that a tender thereof was made and declined.   Ely must have forgotten the circumstances in regard to it.

The check itself for $2,188.20, dated on the day of the sale, is produced, bearing the proper number in the consecutive order of checks in Mitchell's check-book, payable to the order of Ely, president, and the testimony of the person who drew it on the day of its date, and of its delivery to W. C. Davis for the purpose of being tendered to prevent the sale, supplemented by the positive statement of Davis that he actually made the tender, must be held to establish the fact of tender.

As, under the evidence, checks of the parties from whom assessments were due were requested by the treasurer, the tender in that form must be held sufficient, especially so as no objection was made at the time to payment by check.   The refusal of the president to receive the check was placed on another ground.

Whether the check was tendered and refused before or subsequent to the delivery of the note on the morning of the day of sale, its effect would have been the same and should have prevented the sale.   To have that effect, however, the tender should have been unqualified.   There is no evidence of any qualification at the time of the tender of the check, nor is it claimed to have been made at the time the note was

delivered. Ely himself testified that no check was handed to him with the note.

I do not think the refusal of the check was made in bad faith, for the evidence shows that it was intended, by the president, formally to bid in the stock, and that, after the sale, Mitchell might still pay and relieve his stock from the consequences of the sale, and word was sent to him to that effect.

The stock was sold, and was purchased by Mr. Ely, who was, at the time, a director of the company, and its president, at $1.25½ per share.

The sale was made by the directors, and was conducted under the direction of the treasurer; the president himself being present and making the bid for the stock, which was struck down to him individually, and he claims, in this action and on the trial, to have made the purchase for himself.

No auctioneer had been designated for the purpose of making the sale by the board of directors. The by-law passed 19th of December, 1859, provides that, "when the stock of any stockholder shall be ordered, by the directors, to be sold for unpaid assessments, such sale to be made in the city of New York, by such auctioneer as the board shall direct." On the sixteenth of August, 1865, at a meeting of the board of directors, a resolution was passed, "that the treasurer is hereby empowered to sell the stock upon which said assessment (the assessment in question) shall remain unpaid, at public auction, in accordance with the by-laws."

I apprehend that said resolution is not a designation of the treasurer as the auctioneer; nor does the testimony show that the treasurer acted as auctioneer. The meaning of the resolution of the sixteenth of August undoubtedly is, that the treasurer, the fiscal officer, shall conduct the sale; that the same shall be made under his direction, in pursuance of the by-laws, which contemplated the designation of an auctioneer by the board. A designation by the treasurer of an auctioneer

would not satisfy the terms of the by-laws. That required the judgment and decision of the directors themselves.

But there is a more fatal objection to allowing the sale to stand than any yet mentioned, growing out of the fact 'that the president of the corporation claims to be the purchaser of the stock for himself. The relation between the directors who ordered the sale, and who, in fact, made it, and the stockholder, Mitchell, was that of trustee and *cestui que trust*, and that, notwithstanding the fact that Mitchell was himself a director.

That a director, and especially one actually engaged in the proceeding anterior to and at the time of sale, should become a purchaser of the shares of a stockholder he is engaged in selling, for the non-payment of an assessment, is open to very grave objections, and is in violation of well-settled rules of equity.

Under such circumstances, one who sells should be withheld from any temptation to become a purchaser. Such sale may not be absolutely void; the *cestui que trust* may adopt or acquiesce in the sale; but he has the option to demand that the sale be vacated, or that the purchaser be compelled to account to him for the value of the shares.

I am aware that justice SUTHERLAND, at special term, in *Carpenter* agt. *Danforth* (52 *Barb.*, 582), held that a sale of stock by a stockholder to a director is not so far connected with, or the subject of, a trust relation, as to subject the director to the principles of equity applicable to the dealings and contracts of parties between whom there is a trust or confidential relation, so as to call upon the director to disclose to the seller material facts on the question of the value of the stock. But that was a case of the voluntary sale of stock made by a shareholder to one of the trustees for an agreed price. The learned justice, in the course of his opinion, says: " The directors are not trustees for the sale of the stock of the corporation. They have no power, as directors, to sell stock. They have no power to sell any stock but their own. The

defendant, Danforth, was not a trustee for the sale of the plaintiff's stock. The plaintiff's stock was not a subject of trust between them, nor had the trust relation between them any connection with the plaintiff's stock."

But in the case we are considering, the directors were trustees for the sale of the stock. They had power, under the Vermont statutes, as directors, to sell and receive the proceeds of the sale; and were obliged, after deducting the amount of the assessment, to pay over to the stockholders in default the residue of the moneys arising on the sale (§ 12, *chap.* 86, *of the compiled Laws of Vermont of* 1862; *Butts* agt. *Wood,* 37 *N. Y.,* 317; *Gardner* agt. *Ogden,* 22 *N. Y.,* 332).

The evidence does not satisfy me that Mitchell ever approved of, adopted or acquiesced in the sale of his stock or its purchase by the president.

It appears that the president did not, on the day of the sale, pay, and has not subsequently paid for the stock; that he has not, in fact, completed his purchase. It does not appear that any memorandum of the sale was made or assigned by him. Some eighteen months after the sale he made a tender to the treasurer of the amount for which he bid in the stock, which was declined. It does not appear whether the sale was made for cash or on credit. The terms disclosed at the sale do not appear in evidence.

Davis testified that the president said to him on the day of sale that he would bid in the stock and protect it, and it could be arranged afterwards. Mitchell declined to recognize the sale as valid.

Mr. Ely has testified to two interviews between himself and Mitchell subsequent to the sale. On the first occasion nothing was said on the subject. The second interview occurred in the street, when Ely met Mitchell on the corner of Fortieth street and Madison avenue, on the 1st of January, 1868. Ely testified that he said to Mitchell: "'I understand that you are dissatisfied with our proceedings in regard to the sale of that

stock.' He said, 'Yes, you had no right to sell the stock, at least no more than enough to pay the assessment.' I said, 'Mr. Mitchell, I bought that stock; now, if you will pay your assessment, place us where we could have been if the sale had not taken place, this stock is yours.' Said I, 'Have you now anything to complain of?' He said to me, 'I know nothing about it,' turned on his heel and left me in the street." This evidence fails to show any recognition or adoption by Mitchell of any purchase of the stock in question by the president of the company to his own use. Ely subsequently offered the stock to the corporation at the rate at which it was struck down to him, and then made the tender of payment to the treasurer above mentioned.

On the 15th day of May, 1868, the directors resolved "that the stock of Samuel L. Mitchell, bought by Mr. Ely at a sale for assessment, September 17, 1866, having been by him repeatedly offered to the company, at the cost to him, we accept his proposition, and the stock to be held by him subject to our order."

On the 22d of August, 1868, the directors passed a resolution rescinding the resolution of the fifteenth of May, Mr. Ely voting for the resolution.

Under the circumstances of this case I am of opinion that the sale made on the 17th of September, 1868, of the stock of Mitchell was invalid; that the defendant, Ely, acquired no title to himself thereby, and that the same should be set aside.